UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
GILBERT P. HYATT, )
)
Plaintiff, ) Civil Action No. 05-2310 (RCL)
) Civil Action No. 09-1864 (RCL)
v. ) Civil Action No. 09-1872 (RCL)
)
ANDREI JANCU, )
)
Defendant. )
)

MEMORANDUM OPINION!

I. Background

Before the Court is a trio of actions brought under 35 U.S.C. §145, related to three of
Gilbert Hyatt’s applications to patent features of his “600- family” and “700-family” specifications
that purport to describe innovations Mr. Hyatt made in the field of video processing and associated
computing and memory architectures in the mid-1980s. Plaintiff Gilbert P. Hyatt is a prolific
inventor who has received more than seventy issued patents and has, pending at various stages of
prosecution and appeal, nearly 400 patent applications before the United States Patent and
Trademark Office (PTO), the federal agency responsible for examining patent applications and for
granting U.S. patents. 35 U.S.C. § 1, et seq. Andrei Iancu is the named defendant in these matters

in his official capacity as the Under Secretary of Commerce for Intellectual Property and the

' Although these cases were not consolidated for trial, because of their complex but nevertheless overlapping records
and litigation histories, and common legal issues, the Court is issuing this single opinion concerning the merits in all
three matters. Separate judgments will issue in each case.

1
Director of the PTO.” Because of the nature and lengthy history of these actions, the Court refers
to the defendant as “PTO” throughout this opinion.

Mr. Hyatt brought these actions pursuant to 35 U.S.C. § 145 to obtain patents on three of
his patent applications following decisions in the Board of Patent Appeals and Interferences, now
known as the Patent and Trial Appeal Board (the “Board”).> Section 145 allows an applicant
dissatisfied with the decision of the Board to “have remedy by civil action” in district court, rather
than taking an appeal directly to the Federal Circuit.4 See also Kappos v. Hyatt, 566 U.S. 431
(2012). In a series of opinions issued August 23, 2016, the Court found genuine disputes of
material fact precluded summary judgment in these matters, which therefore required trials on the
merits.°

After the Court resolved the summary judgment motions, however, the PTO moved to
dismiss these actions for prosecution laches. Def.’s Mot Dismiss, ECF No. 91. In that set of
motions, PTO argued that Hyatt’s conduct in prosecuting these three patent applications, as well
as approximately 400 others, called for dismissal. /d. at 8-9. Mr. Hyatt, on the other hand, argued
that the PTO was responsible for extensive delay in adjudicating many of the applications, Pl. Mot.
Dismiss, ECF No. 101 at 7-9, and made the case that he was entitled to discovery. Jd. at 37-38.
On March 16, 2017, the Court found that genuine disputes of material fact required treating the

motions to dismiss as if they were for summary judgment, and denied them accordingly. ECF No.

116.

2 Andrei Iancu has been automatically substituted for Joseph Matal in these actions under Fed. R. Civ. P. 25(d).

3 Case number 05-cv-2310 relates to the 08/457,211 application (the 211 application); No. 09-cv-1864 relates to the
08/456,398 application (the °398 application); and No. 09-cv-1872 relates to the 08/431,639 application (the *639
application). Ail docket citations herein are to 05-cv-2310 unless otherwise specified.

‘ At the time Mr. Hyatt filed the present cases, venue lay by statute with the District Court of the District of Columbia.
In 2011, Congress amended the venue provision of certain patent-related statutes, including §145, such that suits under
those sections are henceforth to be filed in the Eastern District of Virginia. Pub. L. 112-29, §9 (Sept. 16, 2011).

> See ECF No. 75 (05-cv-2310); ECF No. 71 (09-cv-1864); ECF No. 72 (09-cv-1872).

2
With leave of Court, the PTO subsequently amended its answers to assert prosecution
laches as an affirmative defense. ECF No. 123. The Court set the PTO’s affirmative defense of
prosecution laches across all three actions for a bench trial,° which also would consider evidence
relating to Mr. Hyatt’s approximately 400 other pending applications. ECF No. 150. The PTO,
bearing the burden of proof on the affirmative defense of prosecution laches and upon agreement
of the parties, presented its case-in-chief first. During the five trial days beginning October 6,
2017, during which the PTO presented its case-in-chief, the PTO presented the testimony of three
witnesses. The parties also introduced a number of exhibits.’

At the close of the PTO’s case-in-chief on prosecution laches, Mr. Hyatt moved for
judgment pursuant to Federal Rule of Civil Procedure 52(c). Upon consideration of the evidence
and arguments presented during trial and the entire records in these cases up to that time, and
review of the relevant case law, the Court found the PTO failed to prove unreasonable and
unexplained delay that would support dismissal for prosecution laches, and accordingly granted
Mr. Hyatt’s motion.’ The Court’s ruling on prosecution laches necessitated trials on the merits in
these three cases. Each of the three trials featured three witnesses: the plaintiff called Mr. Hyatt
and his expert witness, Mr. Bradford Hite, while PTO called its expert, Dr. Kenneth Castleman.

Plaintiff's expert Mr. Hite has booth a Bachelor of Science and a Master of Science degree
in Electrical Engineering from California State University at Northridge. For the past 23 years, he

has worked as an electrical engineer for ITT Corporation (including as a technical lead on certain

© The PTO’s prosecution laches argument, and the accompanying trial, also applied to a fourth case, 09-1869, arising
out of a §145 matter related to patent application 08/472,062, entitled “A System of Weighting and Scaling Image
Information.” The affirmative defense was the last unresolved issue in that case, so it did not proceed to a trial on
the merits.

7 Because the proceedings regarding prosecution laches are part of the record in each of these three cases, in addition
to one other, see 09-cv-1869, the Court includes for background some citations to that October 2017 trial.

8 In addition to the present Opinion and in accord with Federal Rule of Civil Procedure 52(a)(1), the Court today
also issued a separate Memorandum Opinion, Findings of Fact, and Conclusions of Law further explaining its ruling
on the PTO’s affirmative defense.
projects), Magellan Systems, Raytheon, Curtis-Wright, Lear Astronics, MiniMed, RoundTrip
Technologies, SiRF, Quallion LLC, Paylon Medical, ASML, and Neural Analytics. Trial Tr.
32:25-49:5 (Nov. 14, 2017 AM Session) (09-1872). Mr. Hite has worked on complex electrical
engineering projects involving missile defense radars, flight control systems, the Global
Positioning System (“GPS”) for consumer and military applications, glucose meters and insulin
pumps for diabetics and cancer pain-management, long-distance tracking, battery modules for
military aircraft and space applications, avionics computers, and Doppler radar imaging for
concussions in football.

Mr. Hite’s experience with memory systems and image processing includes a project at
ITT in 1984 working on graphical displays for equipment that interfaced with external control
devices like keyboards for which he contributed computer code, and working on image
processors and various types of memory architectures for a Navy missile defense project with
ITT in 1987. During his tenure at Magellan, Mr. Hite worked on dot-matrix LCD displays that
would scan out images, using a block of Random Access Memory (“RAM”) to do so. At
MiniMed, Mr. Hite’s work included a graphical interface with RAM memory organization, and
Mr. Hite wrote software to test and operate the display. Jd. Mr. Hite was qualified without
objection as an expert in application-specific processors, including memory and image
processing. Trial Tr. 49:2-6 (Nov. 14, 2017 AM Session) (09-1872).

Defense expert Dr. Castleman received his Bachelor of Science, Master of Science, and
Doctor of Philosophy (Ph.D.) degrees in Electrical Engineering from the University of Texas at
Austin. See Trial Tr. 477:9-11 (Feb. 14, 2018); see also DX3034 (0003). Dr. Castleman has more
than fifteen years of experience in image processing for public sector endeavors, including in the

image processing lab at NASA’s Jet Propulsion Laboratory as a member of the Scientific
Working Group on Imaging Technology for the FBI, where he assisted NASA in the image
analysis of the Challenger and Columbia space shuttle accidents. See DX3034 (0001); see also
1872 Trial Tr. 19:14-22:19 (Nov. 15, 2017 PM Session). He also has about twenty years of
private sector experience designing and building image processing systems as president (or
CEO) of a company he co-founded. See Trial Tr. 477:11-14 (Feb. 14, 2018); see also Trial Tr.
1872 Trial Tr. 19:14-21:4 (Nov. 15, 2017 PM Session); 1872 Trial Tr. 22:20-24:15 (Nov. 15,
2017 PM Session); DX3034 (001-002).

Dr. Castleman has written college-level textbooks on image processing, including Digital
Image Processing (1979 and 1996 editions), published more than 60 scientific articles in
technical journals, and has taught college courses related to image processing. See 1872 Trial Tr.
24:16-26:22 (Nov. 15, 2017 PM Session); Trial Tr. 477:23-478:2 (Feb. 14, 2018). He has
previously served as an expert in approximately 33 cases. See DX3024.

Each trial lasted five days. The Court addresses each case in chronological order by docket

number, rather than the order in which they were tried.

Case 05-2310 (the ’211 application)

Civil case 05-2310, filed November 18, 2005, concerns patent application 08/457,211 (the
°211 application), entitled “Improved Image Processing Architecture,” which Mr. Hyatt filed with
the PTO on June 1, 1995. One of several applications flowing from Mr. Hyatt’s 641-page’ ““700-
family” specification, the °211 application is a continuation of patent application serial number
07/289,355, filed December 22, 1988, which is a continuation of patent application serial number

06/663,094, filed October 19, 1984. The PTO entered a non-final Office Action rejecting the

° The specification contains 576 pages of text and 65 pages of figures. PTX-001.05255--5830; PTX-001.05840-905.
5
claims on September 22, 1995, and entered a final rejection made on July 31, 1996. Mr. Hyatt,
using the transitional rules provided in 37 C.F.R. § 1.129(a) (“Rule 129(a)”), petitioned to file an
amendment, the effective equivalent of a continuing application, on March 25, 1997. PTX-
004.06587-89. The PTO issued a non-final Office Action rejecting the claims on August 3, 1998.
PTX-004.6053-54. The PTO entered a final rejection of all claims on August 27, 1999. PTX-
004.06373.

Mr. Hyatt timely noticed his appeal to the Board on February 28, 2000, and he filed his
appeal brief on August 28, 2000. PTX-004.04965. In the course of its decisions on Mr. Hyatt’s
appeal and subsequent motion for reconsideration, the Board reversed several rejections by the
examiner of the ’211 application claims and upheld others. See PTX-004.00103-04. Two
hundred twenty-one claims in the ’211 application remain before the Court, all of which were
rejected by PTO for lack of written description. ECF No. 227 at 1. During a five-day trial that
began on December 4, 2017,'° Mr. Hyatt presented new evidence concerning sixty-six of those

claims. See PTX-912.!!

Case 09-1864 (the ’398 application)

Civil case 09-1864, filed September 25, 2009, concerns patent application 08/456,398 (the
°398 application), also entitled “Improved Image Processing Architecture” and sharing the 700-
family specification, was similarly filed with the PTO on June 1, 1995. Like the ‘211 application,

the ‘398 application is a continuation of patent application serial number 07/289,355, filed

10 The trial in this case was originally scheduled to ran December 4-8, 2017, but was suspended on December 6,
2017 due to a medical emergency. The Court had previously been assigned to sit by designation in the Western
District of Texas beginning January 2, 2018. With the parties’ consent and to conserve judicial and the parties’
resources, and consistent with 28 U.S.C. §141(b)(1), the Chief Judge of the District Court for the District of
Columbia authorized this trial to resume as a special session in San Antonio, Texas. ECF No. 223. The special
session in this case took place on January 18-19, 2018.

"! Claim 467 is erroneously listed twice on page 164 of this exhibit.

6
December 22, 1988, which is a continuation of patent application serial number 06/663,094, filed
October 19, 1984. PTX-001.05919-23. The PTO entered a non-final Office Action rejecting the
claims on September 19, 1995, and a final rejection on August 9, 1996. PTX-001.05137. Mr.
Hyatt petitioned to enter a submission pursuant to 37 C.F.R. § 1.129(a) with an amendment,
effectively equivalent to a continuation application; the PTO subsequently rejected the then-
pending claims in a non-final Office Action on December 12, 2000. PTX-001.04505—-06. Mr.
Hyatt amended the claims on January 30, 2002. PTX-001.04268-69. The PTO issued a non-final
Office Action rejecting all claims on September 7, 2004. PTX-001.04025-26.

Mr. Hyatt timely noticed his appeal to the Board on March 7, 2005. PTX-001.03898. He
filed his appeal brief on August 26, 2005, thereby closing prosecution. PTX-001.00928. In the
course of its decisions on Mr. Hyatt’s appeal and subsequent two motions for reconsideration,
the Board reversed numerous grounds of rejection found by the examiner of the °398 claims and
upheld others, concluding the PTO’s administrative adjudication of the °398 application on July
8, 2009. A total of twenty-eight claims in the °398 application remain subject to Mr. Hyatt’s
§145 action before this Court: twenty-two rejected for lack of written description, and six
because of anticipation.!* A five-day trial began February 12, 2018,!3 during which new
evidence was presented on each of the twenty-eight claims. See PTX-917.

Case 09-1872 (the °639 application)

12 Mr. Hyatt has also asked the Court to order patents to issue on ‘398 application claims for which examiners’
rejections were reversed by the Board, but are not part of the present litigation. See 09-1864 ECF No. 220 at 1. The
Constitution’s case or controversy requirement bars the Court from issuing an Order on claims not in dispute before
it. U.S. CONST. ART. ITI, §2(1).

13 The trial in 09-1864 was originally scheduled to begin on December 11, 2017. Due to the same circumstances
that gave rise to suspending proceedings in 05-2310 and resuming them in the Western District of Texas, the trial
was rescheduled to February 12, 2018 in San Antonio, in accord with the Order Authorizing Special Sessions under
28 U.S.C. §141(b)C1). See 09-1864 ECF No. 215.
Civil case 09-1872, also filed September 25, 2009, concerns patent application
08/43 1,639 (the ’639 application), entitled “Adaptive Memory System,” which Mr. Hyatt filed
on May 1, 1995. One of several applications flowing from Mr. Hyatt’s 564-page!* “600-family”
specification, the °639 application is a continuation application of patent application serial
number 07/279,592, filed December 2, 1988. PTX-003.01380. The PTO entered a restriction
requirement requiring Mr. Hyatt to elect one group of claims for examination drawn to one
invention on October 19, 1995. PTX-003.01311-13. On July 24, 1996, the PTO rejected the
claims in a non-final Office Action. PTX-085.00005. The PTO rejected the claims in a final
Office Action dated May 19, 1999. PTX-085.00005. Mr. Hyatt timely noticed his appeal on
October 19, 1999. PTX-085.00005.

Mr. Hyatt filed his Appeal Brief on April 18, 2000, thereby closing prosecution. PTX-
085.00005. In the course of its decisions on Mr. Hyatt’s appeal and three subsequent motions for
reconsideration, the Board reversed numerous rejections by the examiner of the °639 claims and
upheld others, concluding the PTO’s administrative adjudication of the °639 application on July
8, 2009. PTX-085.00005. Mr. Hyatt filed suit under 35 U.S.C. § 145 to obtain a patent on claims
on which the Board affirmed at least one ground of rejection on September 25, 2009. A total of
fifty-eight claims in the ’639 application remain subject to Mr. Hyatt’s §145 action before this
Court: fifty-two rejected for lack of written description, and six because of obviousness. See 09-

1872 ECF No. 197 at 3;!> 09-1872 ECF No. 220 at 1. A five-day trial began November 13, 2017,

'4 The specification contains 518 pages of text and 46 pages of figures. PTX-003.01333-1896.

'S Document 197, Mr. Hyatt’s pre-trial statement, lists sixty claims, but his challenges to two of those, claims 95 and
215, were withdrawn at trial. See 09-1872 ECF No. 219 at 5. Mr. Hyatt’s proposed findings and conclusions list
seventy-two claims on which he wants the Court to order PTO to issue a patent. See 09-1872 ECF No. 219 at 1.
This appears to include the non-disputed independent claims upon which several disputed claims are dependent, e.g.,
independent claim 103, upon which claims 220-24 depend. The Constitution’s case or controversy requirement bars
the Court from issuing an Order on claims not in dispute before it. U.S. CONST. ART. III, §2(1).

8
during which new evidence was presented on each of the disputed claims. See, e.g., PTX-901;

PTX904.

Il. Legal Standard
a. §145 and Kappos v. Hyatt

Section 145 provides that a patent applicant dissatisfied with the Board’s decision may
sue the PTO in district court to determine the patentability of his alleged invention.'® “The court
may adjudge that such applicant is entitled to receive a patent for his invention, as specified in
any of his claims involved in the decision of the [Board], as the facts in the case may appear
and such adjudication shall authorize the Director to issue such patent on compliance with the
requirements of law.” 35 U.S.C. §145.

In 2012, in a case arising out of one of Mr. Hyatt’s related applications with origins and
ancestry largely in common with the applications at issue here, and also first litigated in this
court,'® the Supreme Court determined that district courts can consider new evidence that was
not before the PTO during prosecution of a §145 plaintiff's antecedent patent application, and
“the district court must make a de novo finding when new evidence is presented on a disputed

question of fact.” Kappos v. Hyatt, 566 U.S. 431, 434 (2012).'" District courts may nevertheless

16 As noted at n. 4, supra, venue for §145 actions now lies in the Eastern District of Virginia. Pub. L. 112-29, §9
(Sept. 16, 2011).

'7 The Supreme Court recently decided with respect to a different patent statute that “any” means “every.” See SAS
Institute Inc. v. Iancu, 138 S.Ct. 1348 (2018). To the extent that reading might be applied in a §145 context such
that the PTO might, as cross-plaintiffs, ask the court in these proceedings to reverse Board determinations in an
applicant’s favor, cf. Troy v. Samson Mfctrn’g Corp., 758 F.3d 1322 (Fed. Cir. 2014) (holding that new issues and
arguments may be presented to district courts in §145 and §146 actions), that question has not been presented in this
case, and the Court will not go beyond the claims Mr. Hyatt has brought before the Court.

'8 See 09-cv-901, concerning patent application number 08/471,702.

'S The Supreme Court held that, in §145 actions, applicants are “free to introduce new evidence . . . subject only to
the rules applicable in all civil actions, the Federal Rules of Evidence and the Federal Rules of Civil Procedure.”
Kappos, 566 U.S. at 444. In so doing, the Court upheld the Federal Circuit’s rejection of PTO’s argument that “new
evidence” be limited to “that [which] could not reasonably have been provided to the agency in the first instance.”
Hyatt v. Kappos, 625 F.3d 1320, 1323 (Fed. Cir. 2010). In other words, the definition of “new evidence” in the rules
applicable to post-trial or post-judgment proceedings such as motions for reconsideration do not apply

9
exercise their discretion to “consider the proceedings before and findings of the Patent Office in
deciding what weight to afford an applicant's newly-admitted evidence.” Jd. at 445 (quoting
Hyatt v. Kappos, 625 F.3d 1320, 1335 (Fed. Cir. 2010).

Section 145 cases remain “hybrid” actions after Kappos, see also SD3, LLC v. Dudas,
952 F.Supp.2d 97 (D.D.C. 2013), and APA deference is owed to Board decisions on claims for
which no new evidence is presented. See Alberts v. Kappos, 917 F. Supp. 2d 94, 104 (D.D.C.
2013) (“If the parties do not submit new evidence during a § 145 proceeding, ‘the reviewing
court must apply the APA's substantial evidence standard to Patent Office fact findings.’)
(quoting Hyatt v. Kappos, 625 F.3d at 1336), aff'd sub nom. Alberts v. Lee, 552 F. App'x 986
(Fed. Cir. 2014).

Like the plaintiffs, the PTO is free to introduce new evidence and arguments for rejecting
a §145 plaintiffs claims on the merits in response to new evidence presented as to those claims.
See also Troy v. Samson Mfctrn’g Corp., 758 F.3d 1322 (Fed. Cir. 2014). All evidence
concerning the claims at issue must be presented to the Court for full consideration, because
Section 145 “does not provide for remand to the PTO to consider new evidence.” Kappos, 556

USS. at 439.

b. Written description requirement
The vast majority of the claims now before the Court are the subject of earlier rejections
within the PTO for lack of written description under 35 USC §112. That statute provides, in
relevant part:
The specification shall contain a written description of the invention, and of the manner
and process of making and using it, in such full, clear, concise, and exact terms as to
enable any person skilled in the art to which it pertains, or with which it is most nearly

connected, to make and use the same, and shall set forth the best mode contemplated by
the inventor or joint inventor of carrying out the invention.

10
The Federal Circuit has explained “[t]he purpose of the ‘written description’ requirement
is broader than to merely explain how to ‘make and use’; the applicant must also convey with
reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in
possession of the invention.” Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563-64 (Fed. Cir.
1991). The rationale for the written description requirement is clear:

‘[A] patent is not a hunting license. It is not a reward for the search, but

compensation for its successful conclusion.’ Requiring a written description of the

invention limits patent protection to those who actually perform the difficult work

of ‘invention’—that is, conceive of the complete and final invention with all its

claimed limitations—-and disclose the fruits of that effort to the public. ... It is part

of the guid pro quo of the patent grant and ensures that the public receives a

meaningful disclosure in exchange for being excluded from practicing an invention

for a period of time.

Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1353’ (Fed. Cir. 2010) (internal citations
omitted). Put another way, “[t]he essence of the written description requirement is that a patent
applicant, as part of the bargain with the public, must describe his or her invention so that the
public will know what it is and that he or she has truly made the claimed invention.” AbbVie
Deutschland GmbH & Co., KG v. Janssen Biotech, Inc., 759 F.3d 1285, 1298 (Fed. Cir. 2014).
Whether there is sufficient written description is ultimately one of fact. See GlaxoSmithKline LLC
v. Banner Pharmacaps, Inc., 744 F.3d 725, 729 (Fed. Cir. 2014).

Whether there is written description support for a claim is examined from the point of view
of one skilled in the art at the time of the claimed invention. Phillips v. AWH Corp., 415 F.3d
1303, 1313 (Fed. Cir. 2005) (“[T]he ordinary and customary meaning of a claim term is the
meaning that the term would have to a person of ordinary skill in the art in question at the time of

the invention, 1.e., as of the effective filing date of the patent application.”’”). Section 112’s twin

requirements, of (1) describing the manner and process of making and using the full scope of the

11
invention, and (2) describing the invention sufficiently to convey the patentee had possession of
the claimed invention, are viewed in this same light and “usually rise and fall together.”
LizardTech, Inc. v. Earth Res. Mapping, Inc., 424 F.3d 1336, 1344-45 (Fed. Cir. 2005).

In determining whether there is sufficient written description, courts do not use bright-
line rules, Ariad, 598 F.3d at 1351, but, in general “the test for sufficiency is whether the
disclosure of the application relied upon reasonably conveys to those skilled in the art that the
inventor had possession of the claimed subject matter as of the filing date.” Jd. Although this
does not require an applicant to detail each and every instantiation of a claimed invention, see id.
at 1352, PTO guidelines, adopted by the Federal Circuit, require “disclosure of sufficiently
detailed, relevant identifying characteristics . . . i.e., complete or partial structure, other physical
and/or chemical properties, functional characteristics when coupled with a known or disclosed
correlation between function and structure, or some combination of such characteristics.” Enzo
Biochem, Inc. v. Gen-Probe Inc., 323 F.3d 956, 964 (Fed. Cir. 2002). In other words, “the
applicant must ‘convey with reasonable clarity to those skilled in the art that, as of the filing date
sought, he or she was in possession of the invention,’ and demonstrate that by disclosure in the
specification of the patent.” Carnegie Mellon Univ. v. Hoffmann—La Roche Inc., 541 F.3d 1115,
1122 (Fed. Cir. 2008) (quoting Vas—Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563-64 (Fed. Cir.
1991)). Further, claims added during prosecution must themselves find support sufficient to
satisfy § 112 in the written description of the original priority application. See, e.g., Anascape,
Ltd. v. Nintendo of Am., Inc., 601 F.3d 1333, 1335 (Fed. Cir. 2010). And if the applicant is
purporting to provide written description for a genus, “One needs to show that one has truly
invented the genus, i.e., that one has conceived and described sufficient representative species

encompassing the breadth of the genus. Otherwise, one has only a research plan, leaving it to

12
others to explore the unknown contours of the claimed genus.” AbbVie Deutschland GmbH &
Co., KG v. Janssen Biotech, Inc., 759 F.3d at 1300.

Although the doctrines of written description and enablement are distinct, determining if
there is sufficient written description support for a broadly claimed invention can be “analogous
to enablement of a genus under § 112, ¥ 1, by showing the enablement of a representative
number of species within the genus.” Regents of the Univ. of California v. Eli Lilly & Co., 119
F.3d 1559, 1569 (Fed. Cir. 1997); see also Kennecott Corp. v. Kyocera Intern., Inc., 835 F.2d
1419, 1421 (Fed. Cir. 1987) (“These requirements may be viewed separately, but they are
intertwined.”). A claim does not satisfy the written description requirement when it recites “a
technically difficult solution that the . . . specification does not solve, let alone contemplate or
suggest as a goal or desired result.” Cisco Systems, Inc. v. Cirrex Systems, LLC, 856 F.3d 997,

1010 (Fed. Cir. 2017).

c. Anticipation rejections

In case 09-1864, the Court is considering six claims in the ’398 application subject to
anticipation rejections. A patent application will be rejected for anticipation under 35 U.S.C. §
102 if “the invention was patented or described in a printed publication . .. more than one year
prior to the date of the application...” 35 U.S.C. § 102(b) (2006).”° If every claim limitation
recited was disclosed in a single prior art reference (i.e., publications showing that the
technology was known before the instant application) more than a year before the applicant filed
the application, the application will be rejected. In re Schreiber, 128 F.3d 1473, 1477 (Fed. Cir.

1997); In re Spada, 911 F.2d 705, 708 (Fed.Cir. 1990).

?° Section 102 was amended by the Leahy—Smith America Invents Act, Pub.L. 112-29, Sec. 3, 125 Stat. 284 (Sept.
16, 2011). But, the old version still applies to this case, since the patent application was filed well before the
amendment's effective date. See id. Sec. 35

13
d. Obviousness rejections

In case 09-1872, the Court is considering six claims in the ‘639 application for which Mr.
Hyatt challenges their obviousness rejections. For two of the claims, Claims 89 and 104, he
challenges the rejection on two independent grounds. A patent application will be rejected for
obviousness where “the differences between the subject matter sought to be patented and the
prior art are such that the subject matter as a whole would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which said subject matter
pertains.” 35 U.S.C. § 103(a) (2006). Obviousness is a legal conclusion underpinned by “factual
questions relating to the scope and content of the prior art, the differences between the prior art
and the claimed invention, the level of ordinary skill in the art, and any relevant secondary
considerations such as commercial success, long-felt need, and the failure of others.””!
PharmaStem Theapeutics, Inc. v. ViaCell, Inc., 419 F.3d 1342, 1359 (Fed. Cir. 2005).

To render a claimed invention obvious, the prior art must allow or enable one skilled in
the art to create the claimed invention. See In re Kumar, 418 F.3d 1361, 1368 (Fed. Cir. 2005)
(citing Motorola, Inc. v. Interdigital Tech. Corp., 121 F.3d 1461, 1471 (Fed. Cir. 1997)); cf KSR
Int'l v. Teleflex Inc., 550 U.S. 398 (2007) (“If [an obvious combination of elements] leads to the
anticipated success, it is likely the product not of innovation but of ordinary skill and common
sense.”). The prior art itself need not be enabled, since even “a non-enabling reference may
qualify as prior art for the purpose of determining obviousness, and even an inoperative device is

prior art for all that it teaches.” ABT Sys. LLC v. Emerson Elec. Co., 797 F.3d 1350, 1360 n. 2

2| Referred to as the Graham factors, these considerations are derived from the Supreme Court's decision in Graham
v. John Deere Co., 383 U.S. 1, 17—18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). It is the rule in the Federal Circuit that
district courts evaluating a claim of obviousness engage in the inquiry outlined in Graham. Ruiz v. A.B. Chance Co.,
234 F.3d 654, 662-63 (Fed.Cir.2000).

14
(Fed. Cir. 2015) (internal punctuation omitted) (internal quotation marks omitted) (quoting
Symbol Tech., Inc. v. Opticon, Inc., 935 F.2d 1569, 1578 (Fed. Cir. 1991) and Beckman

Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989)).

Ill. Analysis

Before reaching the claims themselves, the Court must determine the characteristics of
one of ordinary skill in the relevant arts, whose point(s) of view the Court must adopt in
reviewing the claims in each of these applications. Two of the applications, the ’211 application
and the ’398 application, have the same lineage and a common ancestor application making their
claim priority date October 1984. The ’639 application has a slightly newer origin, with a claim
priority date of December 1988.

The Court finds that an ordinary artisan in 1984 attempting to practice the technology the
700-family specification purports to teach in the ‘211 and ‘398 applications, would have a
master’s degree in electrical engineering or closely related field, and three to five years’
experience in digital circuit design. The ordinary artisan in 1984 attempting to practice the
technology taught in the 600-family specification as applied in the ‘639 application would have a
master's degree in electrical engineering or a related field, and would have three to five years of

experience in designing logic and circuits.

a. Claims Rejected by PTO for Lack of Written Description
To satisfy the written description requirement under §112, one must: (1) “describe the
manner and process of making and using the invention so as to enable a person of skill in the art
to make and use the full scope of the invention without undue experimentation” and, (2) “describe

the invention sufficiently to convey to a person of skill in the art that the patentee had possession

15
of the claimed invention at the time of the application, i.e., that the patentee invented what is
claimed.” LizardTech, 424 F.3d at 1344-45. This determination is one of fact. GlaxoSmithKline,
744 F.3d at 729. With certain exceptions, Mr. Hite’s expert testimony illuminated the necessary
facts supporting a finding of written description on most of the still-disputed claims for which Mr.
Hyatt presented new evidence.

In determining de novo the patentability of claims for which new evidence has been
presented, determinations of the Board are not accorded deference, nor are grounds of rejection
identified in relevant Office Actions evidence of the matters asserted therein, though the Court
has discretion to consider the earlier proceedings and findings when weighing the new evidence.
See Kappos, 566 U.S. at 445. Thus, the key inquiry for the Court with respect to written
description support is whether it exists and whether it could have been discerned by a reasonable
artisan, not whether the examiner or Board discovers it. Here, those rejections serve as the
backbone of PTO’s defense in these cases, since PTO has not asserted any additional grounds of
rejection since litigation commenced, as Troy suggests they could have. See 758 F.3d 1322.

In each of the three cases at bar, PTO cites to Purdue Pharma L.P.’s metaphor that “one
cannot disclose a forest in the original application, and then later pick a tree out of the forest and
say [‘Jhere is my invention.[’]” ECF No. 228 at 68; 09-1864 ECF No. 227 at 96; 09-1872 ECF
No. 220 at 69, quoting 230 F.3d at 1326-27 (citing In re Ruschig, 379 F.2d 990 at 994-95 (CCPA
1967). This Court, however, is mindful of the context of Purdue Pharma and its limited
applicability with respect to most of the challenges at issue in these cases. In Perdue Pharma,
certain vague adjectives (i.e., “flat” and “substantially flat”) in the specification were found not
to define the specific measurement parameters and concepts Purdue later claimed. The examples

provided in Purdue’s application likewise failed to make clear that the later-claimed property of

16
the invention (a concentration ratio for a delayed-release opioid) was “an important defining
quality” of the originally filed disclosure. 230 F.3d at 1327.

Although Purdue Pharma is instructive here in the respects for which it is cited infra,
PTO’s thematic reliance on the forest and trees metaphor is, for the most part, misplaced in the
present matters. In these cases, PTO largely supports the written description rejections by
appealing (though never explicitly) to a needle-in-a-haystack metaphor. And while it is
understandable as a practical matter that it is difficult for even the best patent examiners to track
several hundred pages of specification, especially as they attempt to apply to it the guidance
contained in a 3,000 page manual, that fact holds little weight in a §145 case. The tenet central
to the Supreme Court’s holding in Kappos is that additional evidence may exist that assists a
district court in finding, e.g., written description support that, for whatever reason, had not earlier
been found or deemed adequate.”

Also common across all three applications is a series of plaintiff's exhibits prepared
specifically for trial depicting graphically Mr. Hyatt’s “top-down” design of his inventions. See,
e.g., PTX-910 at 32 (graphical representation of the “top-down” design); PTX-912.005-10
(“Figure 1A” and associated figures). The PTO argues the Court should give these figures little
to no weight, as neither they, nor their expert Dr. Castleman, saw them prior to Mr. Hyatt’s
testimony on the first day of the first merits trial. But evidence such as this, and plaintiff's expert
Mr. Hite’s testimony, is exactly the type of new evidence that is helpful to the Court in a §145

case.

22 To the extent the Court is fairly characterizing the PTO’s metaphorical approach, it is noteworthy that it is not
here looking for a needle in a haystack, but rather some of the hay which, far from being out of place, has always
been there and, according to the inventor, is integral to the haystack itself. The Court’s finding written description
support for certain claims in this instance is thus not a moral judgment of any sort as to examiners’ or the Board’s
diligence — indeed, it took many hours of expert testimony over many weeks of trial for the Court to be able to make
these findings. Rather, the Court’s findings rely heavily upon the new evidence presented at trial, in the form of
expert testimony, establishing that certain of Mr. Hyatt’s claims have adequate written description support.

17
As such, the Court recognizes that it has had the benefit of Mr. Hyatt’s and Mr. Hite’s
diagrams, figures, and in-court presentation, as it is required to consider under Kappos,
establishing that the descriptive features in question were included in Mr. Hyatt’s respective
applications (even without the video contemporaneously documenting and describing features of
his experimental system). What is left for the Court is merely to find whether ordinary artisans
in the 1980s could similarly have discerned the substance of the inventions as Mr. Hyatt has
described and Mr. Hite has laid bare. With some particularized exceptions, the Court finds that
the ordinary artisan could.

Mr. Hite’s claim mapping technique very clearly points out where the specification
recites the features appearing in the still-challenged claims. The PTO correctly observes that
neither the examiners of these applications nor the Board had the benefit of a presentation like’
Mr. Hite’s, but that is irrelevant to the merits of the de novo §145 actions. Still, while Mr. Hite’s
claim mapping paints a clear picture of Mr. Hyatt’s best case for written description support of
his still-challenged claims, it does not carry the day for all the claims before the Court, where
ambiguities or an unreasonably large number of potential permutations of chip sets, for example,
do not satisfy the Court that the specification provides adequate written description support for
those claims.

PTO also objects to the Court’s consideration of Mr. Hyatt’s video submitted as part of
PTO’s former Documents Disclosure Program, arguing it to be irrelevant to these cases. See,
e.g., 09-1864 ECF No. 227 at 105. PTO argues that 37 C.F.R. §1.57 does not allow Disclosure
Documents to be incorporated by reference into patent applications, see, e.g., 09-1872, dkt 220 at
26 n.12 (“The only incorporated material that may be relied upon for purposes of demonstrating

written description are “a U.S. patent or U.S. patent application publication.’ ... [A] Disclosure

18
Document is not a U.S. patent application.”) (quoting §1.57(d)), and, even if it did, the program
only permitted documents and photographs to be submitted, and Mr. Hyatt’s videotape evidence
is neither.

PTO’s reading of §1.57(d) in isolation is unpersuasive here, for three reasons. First,
subsection (d)’s definition of “essential material” is too narrow in the present context, where
there is new evidence (i.e., Mr. Hite’s testimony and expert report) for the Court to consider.
Second, under subsection (f), an examiner can require copies of any material, essential or not,
that has been incorporated by reference — the video prospectively satisfied any obligation Mr.
Hyatt would have had in that regard. Third, subsection (g) provides for material incorporated by
reference to be attached as a later amendment, which the Court potentially could order be done
here.

The Court understands, however, the sound reasons for PTO’s resistance to Mr. Hyatt’s
video demonstration of his experimental system in the examination (vs. litigation) context. If,
for example, there was no way to make the video publicly available contemporaneous with any
issued patent, then, by definition, the video could not teach the invention. This is especially true
concerning applications filed before file wrappers were digitized and the PTO’s patent database
was available online. Even today, where PTO’s patent databases are fully searchable online,”
this Court is not in any position to order PTO to create a “PatentTube” site to host video content
in connection with patent applications, although the PTO would certainly be free to do so if it so
chose. And, in these matters, merely transcribing the video and ordering the transcript attached

to the patents to be issued would not be very helpful to the public.

23 See https://www.uspto.gov/patents-application-process/search-patents.

19
The above merely demonstrates one way in which there is a disconnect between the
material Mr. Hyatt presented to examiners that may not have conformed to certain PTO
regulations at the time, and what this Court may consider de novo in determining patentability
under §145. Even assuming PTO properly disregarded the video during examination, that
merely renders the video “new evidence” for the purposes of these actions, and there is no doubt
the video disclosure, at a minimum, tends to prove Hyatt’s possession of certain features of the
inventions claimed in the present applications at the time the video was recorded. Because the
video is not part of the specification and cannot be readily included in useful form in an issued
patent, however, it can be given little weight to the inquiry of whether it can be said to have
taught the purported invention(s) to the ordinary artisan at the time the respective applications

were filed.”*

i. Written Description Rejections in 05-2310 (the ’211 application)
The ’211 specification purportedly recites an improved image processing system and
certain uses for it. In particular, the specification discusses image processing “capable of
geometrically manipulating a highly detailed image in true real time; such as for simultaneous
rotation, translation, expansion, compression 3D perspective, and warping at a 30-times per
second update rate.” A93. The manipulated image can be imported “from a video camera or

from a database memory.” Jd. In the ’211 specification, the terms rotation, translation,

4 To be sure, the video evidence at-issue that shows implementation of certain features claimed in Mr. Hyatt’s
applications unambiguously shows possession of those inventive features as of the date of the video. Strangely,
although PTO argues that the Court should not consider the video as evidence establishing that Mr. Hyatt possessed
the relevant features of his experimental system as being outside of the specifications, PTO also seems to want to it
against Mr. Hyatt where a feature (e.g., 3D perspective or multiple channels) is absent from the experimental
system, even though PTO has not squarely put enablement before the Court. In any event, although it does not offer
much help with respect to written description, the video nevertheless could, however, reasonably assist in traversing
the anticipation and obviousness rejections at-issue in two of these cases, in that it better shows what the system
actually did, versus what is taught in the other patents.

20
expansion, compression, 3D processing, and warping are each described in the context of a flight
simulator application in which an operator uses joysticks to control a virtual airplane. A116-117
(discussing “flight simulator application”); A131; A134; A220 (discussing movement using a
joystick). The user is looking out a window of the airplane cockpit and sees the ground below.
See, e.g., A523 (“The moving map display can be implemented . . . as if the display is a special
optical window in the floor of the cockpit.”). For example, as the user operates the joystick to
move the simulated airplane higher, the user sees objects shrink to look farther away; as the
simulated airplane turns, objects rotate. A116-117; A131 (describing rotation); A134 (describing
shrinking).

The system described in the °211 specification is built upon different technology than
what today is known as graphical user interface (GUD) technology. Mr. Hyatt’s technology relies
on having two monitors. A18 (showing separate “interface” and “mainframe”). One is a
terminal that has input devices such as a keyboard or joystick, in which the user inputs
commands, sets up initial conditions, and selects an image to be displayed. A93-94 (“user
interface comprising a computer terminal with keyboard, joysticks, or trackball’’). For example,
the terminal may show a menu for setting initial conditions of the system. A625. The other
monitor is a display screen that shows the image. A108 (“The processed image is scanned out to
[the] display monitor.”). Mr. Hyatt built an “experimental system” that “embod[ies] the
invention claimed in the ’211 Application.” A108; ECF No. 57-4 at 2. The experimental system
includes these two separate devices: an “interface” or “terminal” for inputting commands and a
separate display monitor for output, shown below right. The terminal shows only text, while the

display monitor shows an image but does not accept any direct user input. Mr. Hyatt’s current

21
claims all include the term “window,” in which these “windows” overlay each other and include
interactive features such as menus and icons.

PTO argues all of the still disputed claims must fail because they recite “windows,” and,
for some, “menus” and/or “icons.” PTO says the term “window” is used in different ways and
not specifically defined in the specification, and, especially when read in conjunction with the
application’s use of “menus, cursors, icons, or other computer operator aids,” can be read
broadly enough to encompass modem graphical user interfaces with user-interactive windows.
The Court disagrees that the specification and claims can be so broadly read. The evidence at
trial indeed revealed multiple possible meanings of the word “window” across the ‘211
application’s 641-page specification, but each would have been distinctly understood from
context and usage by an ordinary artisan in 1984. Even a layman of moderate sophistication can
recognize the difference between a “window” that is a portion of image memory, for example,
versus that which we call a “window” that is a defined portion of what is displayed on a
computer screen. The two uses are not interchangeable in context. Nor is PTO’s argument
furthered by the notion that menus and icons fall into the general category of “operator aids,” as
the evidence makes clear the limits of the technology Mr. Hyatt developed in the early 1980s.
Mr. Hyatt’s system depended on a separate terminal to receive input and generate the desired
outcome on the display screen; it was not a self-contained personal computing system (though,
as discussed below, the ‘639 application purports to invent an image memory architecture useful
in such a system). Although phenotypically similar, there is a very basic and readily discernable
difference between icons or menu commands that are, in effect, self-executable (i.e., icons that
represent operations, e.g., .exe files, or menu items that similarly require a mere click of a mouse

to execute a command), versus those that are merely graphical or textual representations of

22
images, portions of images, representations or other thumbnails of images, or even certain
options from which a human operator may choose within a program but which require a different
terminal to execute. Even the PTO’s expert, Dr. Castleman, noted that not all menu-driven
interfaces are graphical; graphical interfaces use graphics to facilitate the interaction with the
user. See Trial Tr. 159:1-5 (Jan. 18, 2018).

Even so, in and of itself, the method by which an operator initiates a command to execute
a program or procedure (e.g., typing, point-and-click, etc.), though a necessary precursor to the
image processing done within the computer, is not itself fairly characterized as “image
processing” in a computing sense. Said differently, a photographer who uses a software program
to interface with a computer to achieve “post-production processing” of a photograph is only
himself “processing” the image to the extent that he is giving the computer a set of instructions
through which he hopes or expects the computer to render the desired results through its own
processing system. PTO itself effectively made this argument in case 09-1864 regarding Mr.
Hyatt’s “searching for a feature” claims in his ‘398 application, arguing there is a difference
between a human operator searching for a feature on a screen, versus a computer itself
performing a search given certain inputs. See 09-1864 Trial Tr. 31:25-32:7 (Feb. 12, 2018).
Further, the PTO put on no evidence that the specification contains written description support
for a GUI of the sort it argues the claims could be construed to include.

The looming issue in this case is a question of enablement concerning non-destructive
image overlaying and the requisite multiplexer/demultiplexer (mux/demux) to achieve that
functionality. Mr. Hyatt’s experimental system operated at an image refresh rate of 9MHz on a
single-channel system; Dr. Castleman testified that building a high-speed multiplexer device

needed for true video — 30 frames per second, would require far more inventing than Mr. Hyatt’s

23
application achieves, especially in applications in which each image displayed requires a

separate channel. The mux/demux device used a commonly available 74 LS365 chip, the claims
themselves appear to envision no more than five channels, see, e.g., Trial Tr. 321:6-11 (Jan. 19,
2018) (concerning Claim 394), and anything above five channels would not have been capable of
the processing necessary to handle the associated data rates. The Court therefore finds that the
‘211 application has adequate written description support for up to five channels covering the
helicopter training simulator application, landscape architecture application, moving map display
application, and remotely piloted vehicle application claims for which evidence was produced at
trial.

In light of the above, two hundred, twenty claims remain disputed in the ’211 application
being litigated in case 05-2310; at trial new evidence and argument was heard on sixty-seven of
those claims, leaving one hundred, fifty three claims unaddressed in the relevant proceedings in
this matter.

Section 145 cases are usually referred to as “hybrid” actions because those claims for
which new evidence is presented are decided de novo, while claims for which no new evidence is
presented are reviewed with discretion afforded to the agency’s decision on a substantial
evidence standard. Hyatt v. Kappos, 625 F.3d at 1336. This Court denied summary judgment in
this case because the Court determined there to be outstanding genuine issues of material fact.
See ECF No. 75. In the case of the written description rejections, whether there is adequate
written description is itself the material fact. See GlaxoSmithKline, 744 F.3d at 729 (written
description is a fact question). The Court has reviewed the Board’s rejections of those claims for
which no new evidence was presented at trial, and finds no basis in the administrative record to

come to conclusions contrary to those of the Board. Hyatt’s decision not to put on new evidence

24